1

2

3

4                        UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7    JASON CAI,                              Case No.  19-cv-03067-HSG

8              Plaintiff,                    **ORDER DENYING PETITION FOR
                                             WRIT OF HABEAS CORPUS**
9         v.
                                             Re: Dkt. No. 27
10   NEIL MCDOWELL,

11             Defendant.

12

13        Before the Court is the petition for a writ of habeas corpus of petitioner Jason Cai, brought

14   pursuant to 28 U.S.C. § 2254, challenging the validity of his state court conviction.  Dkt. No. 27

15   ("Am. Pet.").  Respondent has filed an answer to the petition, Dkt. No. 35, and petitioner has filed

16   a traverse, Dkt. No. 40.  For the reasons set forth below, the petition is **DENIED**.

17   **I.    PROCEDURAL HISTORY**

18        Petitioner was charged with one count of murder under California Penal Code § 187(a),

19   with allegations of a lying-in-wait special circumstance, Cal. Penal Code § 190.2(a)(15), and

20   personal and intentional discharge of a firearm during the commission of the murder, Cal. Pen.

21   Code § 1202253 (d).  Am. Pet., Ex. L ("Clerk's Transcript" or "CT"), Dkt. No. 5 at 381–82.[1]

22        On April 10, 2012, a jury convicted petitioner of first-degree murder and found true the

23   special circumstance and gun use allegations.  Dkt No. 7 at CT 1839.[2]  The trial court sentenced

24   petitioner to life without the possibility of parole plus a consecutive term of 25 years to life.  Dkt.

25   No. 8 at CT 2025–26.

26

27   _____

     [1] Given its length, Exhibit L spans Dkt. Nos. 4–19, and the cited pages correspond to the internal
     pagination as reflected by either the CT, the Augmented Reporter's Transcript ("ART"), or the
28   Reporter's Transcript ("RT") unless otherwise noted.
     [2] Petitioner's first trial in 2010 resulted in a hung jury.  Dkt. No. 6 at CT 1050-52.

United States District Court
Northern District of California

1    On November 10, 2016, the California Court of Appeal affirmed the judgment of

2    conviction.  Dkt. No. 27-1 at 5–19.[3]  On February 15, 2017, the California Supreme Court denied

3    review.  *Id.* at 21.

4    On March 10, 2017, petitioner filed a state habeas corpus petition, which was denied by

5    the Superior Court on May 2, 2017.  *Id.* at 23–77.  Petitioner's habeas corpus petition was then

6    denied by the California Court of Appeal on November 1, 2017.  *Id.* at 132.  The California

7    Supreme Court denied his habeas corpus petition on June 13, 2018.  *Id.* at 189.

8    On June 3, 2019, petitioner filed a habeas corpus petition in this Court, along with a

9    request to hold the petition in abeyance while petitioner returned to state court to exhaust

10   additional state remedies.  Dkt. Nos. 1, 2.  The Court granted the request to stay the petition.  Dkt.

11   No. 25.

12   On May 13, 2019, petitioner filed a second state habeas corpus petition, which was denied

13   on July 25, 2019.  Dkt. No. 27-1 at 482–503.  The California Court of Appeal denied petitioner's

14   habeas corpus petition raising the same claims on May 4, 2020, *id.* at 506–25, and the California

15   Supreme Court denied his petition on August 26, 2020, *id.* at 527–93.

16   Petitioner filed the pending Amended Petition on September 25, 2020.  Dkt. No. 27.

17   **II.   BACKGROUND**

18   The following factual background is taken from the November 10, 2016 decision of the

19   California Court of Appeal:[4]

20

21   A.  THE PROSECUTION'S CASE

22   Defendant's wife of less than a year, Ying Deng, drowned in defendant's backyard
swimming pool in 2003.  In June 2005 Deng's mother, Huidi Shen, represented by

23   attorney Paul Gumina, brought a $15 million wrongful death lawsuit against
defendant.  Sometime in June or July 2006, defendant followed Gumina from a

24   courtroom where Gumina was appearing on another matter.  Defendant threatened
Gumina to drop the wrongful death lawsuit or he "could get messed up."  A forensic

25

─────────────

26   [3] For ease of reference, the Court refers to the PDF pagination for Dkt. No. 27-1.
[4] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. McDaniel*,

27   853 F.3d 1049, 1055 (9th Cir. 2017).  Based on the Court's independent review, the Court finds
that it can reasonably conclude that the state court's summary of facts is supported by the record

28   and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366
F.3d 992, 999-1000 (9th Cir. 2004), unless otherwise indicated in this order.

computer analysis showed that defendant had searched for Paul Gumina on the Santa Clara County court website numerous times between March 2007 and March 2008.

After marrying Deng, defendant purchased a $250,000 insurance policy on her life, with himself as the beneficiary.  In May 2006 defendant submitted a claim for the proceeds of that policy.  Gumina also asserted an inheritance claim to the insurance proceeds on Shen's behalf.  Defendant persisted in contacting State Farm claims examiner Mia Brack regarding the contested claim, even though she told him she could not speak with him because he was represented by an attorney.  In August 2007 defendant denied knowledge of the wrongful death lawsuit to Brack.  In September 2007 Brack informed defendant that an interpleader action had been filed, and that State Farm would deposit the insurance proceeds with the court.  Defendant became angry and irritated, and he threatened Brack that God would punish her and anyone who had framed him.

Defendant researched three handguns on the internet in September 2007, including the RG Industries .25 caliber model 42—the type of gun used to kill Zhao.  Two months later defendant successfully petitioned the trial court in an unrelated proceeding to restore his right to own a firearm, which had been suspended until June 26, 2008.  At that hearing defendant denied having researched firearms, and he could not give a reason for wanting his rights restored, other than possibly for hunting, even though he had not previously owned a gun or hunted.

In March 2008 Zhao and another attorney, Parviz Darabi, formally took over the wrongful death case, initiating and aggressively pursuing discovery.  Zhao, who had emigrated from China and was fluent in Mandarin, handled all communications with Shen.  In January 2008 defendant began searching online for Parviz Darabi, with internet hits occurring eight times between January 7 and June 30, 2008.

Also in January 2008 defendant moved in with his ex-wife and their daughter.  According to his mother, defendant was basically homeless and he did not want to work because he did not want to pay Shen should she prevail in the wrongful death lawsuit.  Defendant rode a motorcycle, and his ex-wife did not monitor his coming and going.

In March 2008 defendant engaged in target practice at a local gun club.  At the same time he began searching for Xia Zhao on his laptop.  Over the next few months defendant conducted several searches for Zhao and her law practice, Pacific Crossing Law Office.  In late March defendant searched online for both Xia Zhao and Sig Sauer, a firearm.

In April 2008 Shen learned that defendant had sued her in China, seeking to inherit Deng's real property which included Shen's residence at the time.  Under Chinese law defendant would not be entitled to the property if he were found to have intentionally caused Deng's death.  Zhao referred Shen to a colleague in China, Hong Chun Chen, and provided Chen with documents concerning Deng's death.  Zhao applied for life insurance later that month.  She later told Chen that she purchased life insurance because she feared defendant.

On May 6 defendant returned to the gun club for target practice.  On May 13 Zhao appeared in court on an unrelated case.  She noticed defendant in the courtroom and outside as she was leaving.  Zhao approached defendant and asked if he was Jason Cai.  Defendant threatened to ruin her career if she continued with the wrongful death case.  Zhao took a picture of defendant with her cell phone and called both Darabi and her secretary, Pei Huang.  Zhao told Darabi that defendant was right in front of her and had told her to get out of the case.  Zhao told Huang that defendant was

3

following her and to call the police. Zhao showed defendant's picture to her husband and her father-in-law so they would recognize defendant if he came to the house, and she reported the incident to the police. Later on May 13, defendant searched the internet for directions to Zhao's office.

A week or two after the May 13 courthouse encounter, defendant was loitering in Zhao's office parking lot when she arrived at work. Zhao told Huang, Darabi, and her husband. That evening Zhao parked a few blocks away from her home because she did not want defendant to know where she lived.

Attorney William Pierce had made a court appearance for Darabi in the wrongful death case. On May 20 and 21 defendant searched an internet people finder service for Pierce. Defendant also accessed Zillow.com three times on May 21 for Pierce's home address. On May 23 defendant searched for directions to Pierce's home address. Sometime in May Pierce discovered an envelope addressed to W. Pierce on the windshield of his car parked at his home. The envelope contained a letter referencing the wrongful death case number, threatening "Don't get involved with Xia Zhao's case."

On May 26 defendant's China-based lawyers argued that defendant was entitled to inherit some of Deng's Chinese real estate, presenting Deng's marriage and death certificates to the Chinese court. Attorney Chen, who appeared on behalf of Shen, provided death investigation documents, identifying them in open court as coming from Zhao. Shen asked that the proceeding be stayed pending the outcome of the wrongful death case, of which defendant's attorneys were apparently unaware.

Between the May 26 hearing and her death on July 1, Zhao spoke with Chen frequently by phone, mentioning her fear of defendant almost every time. She told Chen that she kept seeing defendant following her, and she was afraid it was going to end badly.

On June 3 defendant searched for Zhao online, and he again visited the gun club for target practice. On June 10 and 11 defendant searched online for Zhao and Pacific Crossing Law Office. Two photographs, one of Zhao's parking lot and the other a close up of a car in the lot, were retrieved from defendant's phone, date stamped June 11.

On June 20 a couple living on Hamilton Avenue directly east of Zhao's office encountered defendant lingering in front of their apartment for over 90 minutes. The couple owned video surveillance cameras. Also on June 20, Zhao obtained a temporary restraining order against defendant. That order, served by Federal Express, was left on June 24 at defendant's parents' address (the address on defendant's driver's license). Defendant and his mother denied receiving the order, which required defendant to immediately relinquish any firearms. On June 30 defendant accessed both the restraining order and wrongful death cases on the Santa Clara County court website.

On July 1 at 9:50 a.m. Zhao was shot at close range in the parking lot of her office building. Defendant's daughter told police that afternoon that defendant had left the residence at 8:00 a.m. and returned about 45 minutes later saying he had forgotten something. She heard defendant in his closet, and he left again on his motorcycle minutes later. The neighbors' video surveillance cameras captured a person riding a motorcycle into the mall parking lot across from Zhao's office at 9:31 a.m., where he lingered for about 5 minutes. Dispatch logs and eyewitness testimony showed an Asian man wearing a fisherman's style hat confronting Zhao in the parking lot around 9:50 a.m. After fatally shooting Zhao in the head and chest, the man fled on foot.

At 9:52 a.m., the surveillance camera captured a man running east on Hamilton Avenue away from the parking lot. One of the neighbors identified defendant in court as both the man who had loitered in front of his apartment on June 20 and the man shown running from the crime scene in an enlarged photograph extracted from the 9:52 a.m. video footage. Two times on June 30 the same surveillance camera showed a man walking toward Zhao's office building who resembled the man on the 9:52 a.m. video footage.

Seven people witnessed Zhao in the parking lot struggle for her life. Five described the shooter as Asian, and six of the seven described the shooter as wearing a fisherman's style hat—a hat similar if not identical to the one defendant wore daily. One witness identified defendant in court, and another testified that defendant resembled the shooter based on height, weight, body and facial shape, and skin tone. Three others testified that defendant resembled (or was similar to) the shooter.

A criminalist identified 27 out of thousands of possible gun manufacturers in the FBI's database that could have made the gun generating the tool markings on the spent bullets that killed Zhao. One of those manufacturers was RG Industries, and the only RG model that could have produced the tool markings was the RG 42.

On the day of Zhao's murder defendant attended a scheduled court appearance in the wrongful death case, entering a San Jose courtroom around 10:30 a.m. The bailiff observed defendant coughing loudly—the loudest he had ever heard a person cough—for several minutes. The court had held 10 prior hearings in the wrongful death case over a three-year period, and court records showed defendant never having made a personal appearance, although his attorney recalled him making one. His attorney appeared at the July 1 hearing by phone and was unaware defendant would be present.

Following that court appearance, at 12:30 p.m. defendant arrived at the gun club. He returned home where, detached and emotionless, he was arrested at 2:30 p.m. He volunteered to the transport officers that he had been to the shooting range that day and that he was going to beat the case, even though he had not inquired or been informed of the crime for which he had been arrested. The gunshot residue sample tested positive.

The lead investigator interviewed defendant before informing him of the charges against him. Without disclosing the victim's identity, the officer explained that the matter involved an attorney and that defendant had some negative contact with this person in the past. Defendant immediately interjected, "'I never had a negative contact with'" . . . "'whoever [inaudible] is.'"

## B. THE DEFENSE CASE

Defendant testified he was home on the computer when Zhao was shot. He disagreed with the forensic computer examiner regarding human activity on his computer the mornings of July 1 and June 30 when the video surveillance had shown a man walking toward Zhao's office. He denied threatening Brack or telling her he was unaware of the wrongful death lawsuit. He denied searching for Darabi online in January. He denied putting the note on Pierce's car or searching online for Pierce before his lawyer told him about the note. He claimed Shen's "lawyers doing this to me," and he was being framed. Defendant admitted attending court to speak with Gumina, but he was friendly and nonthreatening.

Defendant denied attending court on May 13 to see Zhao. That encounter was a coincidence and he did not threaten her. He admitted going to Zhao's office on June

16 about 9:20 a.m.  He was reading the newspaper in the parking lot when Zhao approached him, and due to his shock, surprise, and not having his camera ready, he left.  He admitted taking photos in Zhao's parking lot, but only to adjust the zoom. Defendant testified that he went to Zhao's office the day he was observed in front of the neighboring apartment.  He had learned from his attorneys that Zhao was seeking a restraining order and he wanted to tell her he did not put the note on Pierce's car. But he was afraid and stayed away from her office until sometime after 5:00 p.m., when he entered the building but no one was there.

Defendant denied being near Zhao's office on June 30, and he denied telling the transport officer he would beat the case.  Rather, he said he would win the case because he was innocent.  He testified that he wanted his gun rights restored to hunt sharks, and that Zhao and Shen were trying to frame him.

Dkt. No. 27-1 at 6–8.

## III.    DISCUSSION

Petitioner contends that (i) the state court's rejection of his challenge to the exclusion of third-party culpability evidence was based on an unreasonable determination of the facts; (ii) the California Supreme Court improperly rejected his claim that his counsel was ineffective; and (iii) the state court's rejection of petitioner's claim that instructing the jury with CALCRIM No. 359 violated his due process rights was contrary to, or an unreasonable application of, clearly established Supreme Court law, and based on an unreasonable determination of the facts.

### A.    Standard of Review

A petition for a writ of habeas corpus is governed by AEDPA.  This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

United States District Court
Northern District of California

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

"Under 28 U.S.C. § 2254(d)(2), deference to a state court decision is also not required where the decision is 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Andrews v. Davis*, 944 F.3d 1092, 1107 (9th Cir. 2019). "This is a daunting standard—one that will be satisfied in relatively few cases." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). The state court's factual findings "are presumed to be correct." *Andrews*, 944 F.3d at 1107. "Unreasonable determinations of material facts can occur where the state court plainly misapprehends or misstates the record in making its findings or where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Id.* (internal modifications and quotations omitted).

**B.     Exclusion of Third-Party Culpability Evidence**

     **i.     Standard of Review**

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling

violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919–20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (alteration in original) (internal quotation marks omitted); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. *See Holmes*, 547 U.S. at 324. "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 326; *see Egelhoff*, 518 U.S. at 42–43 (holding that exclusion of evidence does not violate Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."). But "at times a state's rules of evidence cannot be mechanistically applied and must yield in favor of due process and the right to a fair trial." *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (finding California's application of its evidentiary rules to exclude hearsay testimony that bore persuasive assurances of trustworthiness and was critical to defense violated right to present evidence). The defendant, not the state, bears the burden to demonstrate that the principle violated by the evidentiary rule "is so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Egelhoff*, 518 U.S. at 47 (internal quotation marks omitted).

The exclusion of evidence that another person may have committed the crime may violate due process and the Sixth Amendment. *See Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1972); *Lunbery*, 605 F.3d at 761 (exclusion of critical hearsay testimony pointing to another killer was an unreasonable application of *Chambers*). A due process violation may occur where the

8

excluded evidence had "persuasive assurances of trustworthiness" and was "critical" to the

defense. *Chambers*, 410 U.S. at 302; *see also Cudjo v. Ayers*, 698 F.3d 752, 754 (9th Cir. 2012)

(describing *Chambers* as "clearly establish[ing] that the exclusion of trustworthy and necessary

exculpatory testimony at trial violates a defendant's due process right to present a defense"). The

Supreme Court has observed that "[o]nly rarely have we held that the right to present a complete

defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada*

*v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (per curiam).

     The due process and Sixth Amendment limitations on the exclusion of critical

corroborative defense evidence are clearly established federal law under AEDPA. *See Su Chia v.*

*Cambra*, 360 F.3d 997, 1002–03 (9th Cir. 2004); *DePetris v. Kuykendall*, 239 F.3d 1057, 1062

(9th Cir. 2001).

     **ii.**   **Analysis**

     The California Court of Appeal rejected petitioner's claim that the trial court erred in

excluding proffered third-party culpability evidence, laying out the relevant background and ruling

as follows:

> Defendant argues that the trial court violated his due process and confrontation rights
> by not allowing him to cross examine Zhao's husband and police about a Chinese
> dissident who may have wanted to harm Zhao—Ming Peng—or present evidence of
> Peng's motive and ability to kill Zhao. In limine, defendant proffered the following:
> After telling police why he thought defendant killed Zhao, Zhao's husband told
> police that Zhao won a $150,000 defamation judgment in absentia against Peng
> shortly after Peng's arrest and imprisonment by Chinese officials. After winning the
> case, Zhao was politely visited by someone associated with Peng who warned her
> not to pursue the judgment. Zhao thought that person had ties to criminal activity.
> Her client, also a Chinese dissident, told her not to pursue the judgment and,
> according to Zhao's husband, Zhao dropped the matter. About a month before Zhao
> died, her client consulted her about the judgment, but Zhao's husband was unaware
> of any action taken by Zhao in response to that contact. Peng was in prison in China
> when Zhao was murdered.
>
> Defendant proffered court documents showing the $150,000 defamation judgment
> entered in November 2004, and a December 2004 judgment lien notice by Zhao for
> reimbursement of $61,485 in legal fees. In June 2007 Zhao filed a memorandum of
> costs after judgment declaring $38,015 in accrued interest, and in August 2007 she
> notified the court of her new business address. The parties had portions of Zhao's
> case file, which apparently showed that Zhao had entered an agreement with another
> attorney in May 2007 to locate assets to satisfy the Peng judgment, and that inquiries
> into Peng's assets were made in 2007 and early 2008. Finally, defendant presented
> a declaration by Zhao's client that Peng was a violent man (although Peng had never
> threatened the plaintiff over the defamation suit) and evidence of a 2003 third-party

United States District Court
Northern District of California

United States District Court
Northern District of California

restraining order against Peng. The court granted the prosecution's opposed motion to exclude third party culpability evidence, concluding there was insufficient evidence to link a third person to Zhao's death or to show an inappropriate or insufficient police investigation.

The court did not abuse its discretion excluding third party culpability evidence because defendant failed to proffer evidence linking Peng to Zhao's murder, and no constitutional error occurred. "A criminal defendant has a right to present evidence of third party culpability if it is capable of raising a reasonable doubt about his own guilt. This rule does 'not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.'" (*People v. Sandoval* (1992) 4 Cal. 4th 155, 176, quoting *People v. Hall* (1986) 41 Cal. 3d 826, 833.)

Chinese officials took Peng prisoner in 2004, and he was still imprisoned when Zhao was murdered. Although Zhao had been contacted by someone presumably on Peng's behalf shortly after winning the defamation judgment, she had no contact with Peng or anyone associated with Peng again. Court records showed that the June 2007 declaration of accrued interest was not served on Peng. Indeed, defendant provided no evidence that Peng was aware of the accrued interest, Zhao's asset checks, or her engaging a colleague to collect the judgment. On this record, defendant's third party culpability theory was speculative. Defendant's proffered evidence did not link Peng to Zhao's murder, and it was incapable of raising a reasonable doubt as to defendant's guilt. Nor does the evidence establish an inadequate or compromised police investigation. (*People v. Page* (2008) 44 Cal.4th 1, 37 ["The possibility the police may have chosen not to follow up more thoroughly on all leads does not impeach the evidence against defendant."].)

Defendant argues that the prosecution opened the door "to evidence of the quality of the [police] investigation" when the investigating officer testified that he identified defendant as a suspect after speaking with Zhao's husband and that he eliminated certain motives for the murder. The investigating officer testified that he eliminated carjacking, robbery, and sexual assault as motives for the murder at the crime scene, and he ruled out domestic violence after speaking with Zhao's husband. He testified that he identified defendant as a suspect through the course of his investigation, and he sought an arrest warrant after interviewing witness Owens and speaking with Zhao's husband.

The prosecution did not open the door to third party culpability evidence directly or indirectly by challenging the completeness of the police investigation. Eliciting testimony regarding the state of the crime scene and the accused killer's motive does not implicate third party culpability.

Dkt. No. 27-1 at 14-15.

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural

10

United States District Court
Northern District of California

1   default.  *Barker*, 423 F.3d at 1092, n.3 (citing *Lambert v. Blodgett*, 393 F.3d 943, 970, n.17 (9th

2   Cir. 2004), and *Bailey v. Rae*, 339 F.3d 1107, 1112–13 (9th Cir. 2003)).  The look through rule is

3   applicable here because the Ninth Circuit has held that "it is a common practice of the federal

4   courts to examine the last reasoned state decision to determine whether a state-court decision is

5   'contrary to' or 'an unreasonable application of' clearly established federal law" and "it [is]

6   unlikely that the Supreme Court intended to disrupt this practice without making its intention

7   clear."  *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir. 2013), *amended*, 733 F.3d 794 (9th Cir.

8   2013).  While under the look through rule the habeas court "should . . . presume that the

9   unexplained decision adopted the same reasoning" as the last reasoned decision, "the State may

10  rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on

11  different grounds that the lower state court's decision, such as alternative grounds for affirmance

12  that were briefed or argued to the state supreme court or obvious in the record it reviewed."

13  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

14          With respect to this issue, the Court thus reviews the California Court of Appeal's order,

15  which was the last reasoned decision as to this argument.  In his traverse, petitioner confirms that

16  "his § 2254(d) argument is premised on [the] exception[] set forth in § 2254(d)(2)"—i.e., the

17  "unreasonable determination of the facts" provision.  Dkt. No. 40 at 15.  Petitioner argues that the

18  "state court ignored critical facts" proffered regarding Ming Peng, which was prejudicial because

19  petitioner's theory of the defense was that "the shooting was the result of [victim's] attempt to

20  collect on a judgment she had obtained against [Peng,] a violent Chinese dissident[]."  *Id.* at 11,

21  16.

22          Presuming under *Wilson* that the California Supreme Court's unexplained decision adopted

23  the California Court of Appeal's reasoning, the Court finds that petitioner fails to meet the

24  "daunting standard," *Maddox*, 366 F.3d at 1000–01, that applies to this claim.  In *Perry v. Rushen*,

25  the Ninth Circuit recognized that under California cases interpreting California Evidence Code

26  section 352, "evidence of third party culpability is inadmissible if it simply affords a possible

27  ground of suspicion against such person," and that instead such evidence "must be coupled with

28  substantial evidence tending to directly connect that person with the actual commission of the

11

1    offense."  713 F.2d 1447, 1449 (9th Cir. 1983) (*quoting People v. Green*, 27 Cal. 3d 1, 22 (1980)

2    (internal quotations omitted)).  The purpose of this rule is "to place reasonable limits on the trial of

3    collateral issues . . . and to avoid undue prejudice to the People from unsupported jury speculation

4    as to the guilt of other suspects."  *Id.* at 1453 (alteration in original).  As the California Court of

5    Appeal explained in its opinion in this case, the California Supreme Court has interpreted the rule

6    as not "requir[ing] that any evidence, however remote, must be admitted to show a third party's

7    possible culpability."  Dkt. No. 27-1 at 15 (citing *People v. Sandoval*, 4 Cal. 4th 155, 176 (1992)).

8    Instead, "evidence of mere motive or opportunity to commit the crime in another person, without

9    more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or

10   circumstantial evidence linking the third person to the actual perpetration of the crime."  *Id.*

11          The Ninth Circuit later characterized its task in *Perry* as "determin[ing] whether the trial

12   court's exclusion of Perry's proffered third-party culpability evidence, under *California's* Section

13   352, violated his *constitutional* rights."  *United States v. Urias Espinoza*, 880 F.3d 506, 512 (9th

14   Cir. 2018) (emphasis in original).  The *Perry* court "adopted a balancing test that weighed Perry's

15   right to present evidence against the State's interest in 'reliable and efficient trials,'" and

16   "concluded that Perry's constitutional rights were not violated by the exclusion of the third-party

17   culpability evidence under California's evidence code . . . ."  *Id.* (*quoting Perry*, 713 F.2d at 1451,

18   1455).

19          In this case, petitioner contends that the state court "ignored" and "did not discuss" facts

20   about Peng that he claims were offered in the record.  The Court disagrees.  The Ninth Circuit has

21   confirmed that when considering a claim that a state court "fail[ed] to consider and weigh relevant

22   evidence that was properly presented" to it, a habeas court is "mindful that the state courts are not

23   required to address every jot and tittle of proof suggested to them, nor need they 'make detailed

24   findings addressing all the evidence before [them]."  *Taylor*, 366 F.3d at 1001 (quoting *Miller-El

25   v. Cockrell*, 537 U.S. 322, 347 (2003)).  Here, the California Court of Appeal discussed, at length,

26   the evidence proffered in the trial court as to Peng, including that:

27          • After telling the police directly why he believed petitioner killed the victim, her

28            husband also "told police that [victim] won a $150,000 defamation judgment in

absentia against Peng shortly after Peng's arrest and imprisonment by Chinese officials," Dkt. No. 27-1 at 14;

- "Defendant presented a declaration by [victim's] client that Peng was a violent man," *id.* at 15;
- The victim was "politely visited by someone associated with Peng who warned her not to pursue the judgment," and the victim "thought that person had ties to criminal activity," *id.* at 14;
- "About a month before [victim] died, her client consulted her about the judgment, but [victim's] husband was unaware of any action taken by [victim] in response to that contact," *id.*;
- The victim's "case file . . . apparently showed that [victim] had entered an agreement with another attorney in May 2007 to locate assets to satisfy the Peng judgment, and that inquiries into Peng's assets were made in 2007 and early 2008," *id.* at 15;
- "Court records showed that the June 2007 declaration of accrued interest was not served on Peng," and "[i]ndeed, defendant provided no evidence that Peng was aware of the accrued interest, [victim's] asset checks, or her engaging a colleague to collect the judgment," *id.*; and
- "Peng was in prison in China when Zhao was murdered." *Id.* at 14.

The Court of Appeal's summary of the proffered evidence was accurate, and materially consistent with the information in the record to which petitioner now points in support of his claim that the state court "ignored" facts. *See* Dkt. No. 27 at 52 (referencing Dkt. No. 9 at ART 613–14, 622–27 (transcript of victim's husband's testimony from first trial); Dkt. No. 12 at RT 2296–98 (transcript of testimony from first trial by police officer who interviewed victim's husband); Dkt. No. 6 at CT 1123 (excerpt from "omnibus motions in limine" regarding Peng issue); and Dkt. No. 7 at CT 1492–94 (report of investigation from interview of victim's client). The fact that the Court of Appeal did not specifically recite petitioner's preferred characterizations like "cutthroat" does not matter. As a matter of law, the court did not have to "address every jot and tittle of proof suggested to [it]," or "make detailed findings addressing all the evidence before [it]." *Taylor*, 366 F.3d at 1001. Because the Court of Appeal did not unreasonably determine the facts in light of the evidence presented in the state court proceeding, AEDPA deference applies.

Applying that deferential standard, the Court of Appeal reasonably determined that the evidence was properly excluded as speculative. Far from providing any "direct or circumstantial evidence linking the third person to the actual perpetration of the crime," *Sandoval*, 4 Cal. 4th at 176, trial counsel (like habeas counsel) simply speculated about Peng's potential motive and

ability to hire someone to murder the victim, even while incarcerated in China.  That speculation does not make this one of the "relatively few cases," *Taylor*, 366 F.3d at 1000, in which overriding the state court's determination is justified.  That conclusion is reinforced by the obvious differences between the speculative theory advanced here and the type of clear misapprehension or mischaracterization of the evidence that the Ninth Circuit found sufficient to trigger the § 2254(d)(2) exception in the cases petitioner cites.  *See Andrews*, 944 F.3d at 1101–02, 1112 (California Supreme Court unreasonably concluded that evidence of treatment of inmates in state correctional system would have required the use of testimony from inmates, when several non-inmate witnesses had provided "powerfully effective" and "compelling" testimony on exactly that issue in a hearing before a referee appointed by the Court to take evidence and make findings of fact on issues related to petitioner's ineffective assistance of counsel claim); *Milke v. Ryan*, 711 F.3d 998, 1007–09 (9th Cir. 2013) (state court "seriously mischaracterized key evidence" supporting petitioner's claim by characterizing court documents "as containing mere 'motions and testimony from other cases in which [the key police officer witness] was the interrogating officer,'" when in reality the documents included "[m]ultiple judicial determinations that [the officer] lied in performing his official functions and violated suspects' constitutional rights"); *Taylor*, 366 F.3d at 1004–08 (state courts made an unreasonable determination of the facts where they "treated [the matter] as a swearing-contest" between two witnesses who testified at suppression hearing, but did not acknowledge the testimony of a third witness that "strongly corroborat[ed] [one witness's] account of the interrogation and [stood] entirely unrefuted"); *Bradley v. Duncan*, 315 F.3d 1091, 1100 (9th Cir. 2002) (California Court of Appeal made unreasonable determination of the facts where it "failed to explain why the second judge could unilaterally ignore the first trial judge's findings of fact and conclusion of law regarding the entrapment instructions and not compose even a single sentence to explain away the law of the case doctrine").

Accordingly, because the California Court of Appeal's denial of petitioner's third-party culpability claim was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, and did not result in a decision that was based on an unreasonable

1  determination of the facts in light of the evidence presented in the state court proceeding, habeas

2  relief is **DENIED** as to this ground.

3  **C.    Ineffective Assistance of Counsel**

4  **i.    Standard of Review**

5  To establish ineffective assistance of counsel, a defendant must present evidence that:

6  (1) the defense counsel's representation fell below an objective standard of reasonableness; and

7  (2) defense counsel's deficient representation prejudiced the defendant. *Roe v. Flores-Ortega*, 528

8  U.S. 470, 476–77 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984)).  A court

9  does not need to "address both components of the inquiry if the petitioner makes an insufficient

10  showing on one." *Strickland*, 466 U.S at 697 (recognizing that it will "often" be "easier to dispose

11  of an ineffectiveness claim on the ground of lack of sufficient prejudice").  "'Surmounting

12  *Strickland*'s high bar is never an easy task' . . . [and] the *Strickland* standard must be applied with

13  scrupulous care." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*,

14  559 U.S. 356, 371 (2010)).  Under AEDPA, "[t]he pivotal question is whether the state court's

15  application of the *Strickland* standard was unreasonable.  This is different from asking whether

16  defense counsel's performance fell below *Strickland*'s standard. . . . A state court must be granted

17  a deference and latitude that are not in operation when the case involves review under the

18  *Strickland* standard itself." *Richter*, 562 U.S. at 101.  Thus, a federal habeas must use "a 'doubly

19  deferential' standard of review that gives both the state court and the defense attorney the benefit

20  of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (citation omitted).

21  To satisfy *Strickland*'s first prong, a defendant must show that "counsel's representation

22  fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  "The proper

23  measure of attorney performance [is] simply reasonableness under prevailing professional norms."

24  *Id.*  Thus, a defendant must show that his counsel's acts or omissions were not "within the range

25  of competence demanded of attorneys in criminal cases." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985)

26  (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).  A court's review of counsel's

27  performance "must be highly deferential," and there is "a strong presumption that counsel's

28  conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at

United States District Court
Northern District of California

15

689.

To satisfy the second prong of *Strickland*, a defendant must show that he was actually prejudiced by the deficient representation he received.  *See id.* at 691–92.  That is, the burden is on the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding."  *Id.* at 693.

### ii.    Analysis

In a reasoned decision, the Superior Court denied petitioner's claim that his counsel was ineffective for failing to present expert testimony about the nature of the computer activity that took place around 10:00 a.m. on the day of the murder, noting that the "instant petition contains no declaration from any independent expert and no showing that anything different or helpful could have been said."  Dkt. No. 27-1 at 77.  The Superior Court also found that "[m]uch less is there a showing that an independent expert's testimony might reasonably have made a difference in light of the totality of the evidence."  *Id.*

Petitioner's later petition to the Court of Appeal included for the first time some exhibits excerpting the testimony of the computer expert that testified in the first trial.  *Id.* at 119–20.[5] After the Court of Appeal summarily denied the petition, *id.* at 132, petitioner sought relief on the same claims supported by the same evidence in the California Supreme Court, *id.* at 134–86.  The California Supreme Court also summarily denied the claim in June 2018.  *Id.* at 189.

Because the California Court of Appeal and California Supreme Court summarily denied

---

[5] Significantly, nothing in the record reflects that habeas counsel submitted any declaration from this or any other expert confirming that the expert would have been available and willing to testify at the second trial.  So while petitioner asserts that these excerpts show that "[i]t is now clear that such expert testimony was readily available" under *Strickland*, Dkt. No. 27 at 56, 58, that contention overstates the record in the Court's view.  Nothing about the bare fact that the expert testified at the first trial establishes that such testimony, from this or another witness, was readily available at the second trial.  In the end, the record presented in this proceeding shows that petitioner *never* submitted what the Superior Court initially found was a key part of what was lacking: a "declaration from an independent expert."  *See* Dkt. No. 27-1 at 77.

United States District Court
Northern District of California

1    habeas relief twice as to this issue, Dkt. No. 27-1 at 132, 189, 525 and 593, this Court again looks

2    through those summary decisions and reviews the Superior Court's reasoned decision under the

3    *Wilson* standard.[6]

4            The crux of petitioner's argument is that the California Supreme Court must have relied on

5    the Superior Court's finding that petitioner failed to submit a declaration by the computer expert

6    or other supporting evidence at the first level of review, and that because that finding failed to take

7    into account the later-filed excerpts of the expert's testimony, it "g[ot] facts wrong" so as to be

8    unreasonable and thus not entitled to § 2254(d) deference.  Dkt. No. 40 at 23.  But that argument

9    fails under the *Wilson* test.

10           To begin, the Superior Court's second rationale—its finding that there was no "showing

11   that an independent expert's testimony might reasonably have made a difference in light of the

12   totality of the evidence"—was unaffected by the late-submitted excerpts, and logically it is likely

13   that this was the basis for the California Supreme Court's summary decision.  All counsel added to

14   the record was the testimony of the computer expert from the first trial—a trial that, as the State

15   notes, ended with eleven of the twelve jurors voting to convict petitioner of murder.  Not calling

16   that same witness again fell well within the wide range of professional competence presumed

17   under *Strickland*, and the California Supreme Court reasonably could have so found.  *See Bonin v.*

18   *Calderon*, 59 F.3d 815, 834 (9th Cir. 1995) ("[W]hile the Constitution requires that a criminal

19   defendant receive effective assistance of counsel, the presentation of expert testimony is not

20   necessarily an essential ingredient of a reasonably competent defense."); *Miller v. Anderson*, 255

21   F.3d 455, 459 (7th Cir. 2001) ("A defendant's lawyer does not have a duty in every case to consult

22   experts even if the government is proposing to put on expert witnesses.").  Indeed, "[f]ew

23   decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a

24   _____

25   [6] As to this claim, the State, relying on *Richter*, argues that this Court "must determine whether the
     California Supreme Court could have adopted any reasonable bases for denying the claim."  Dkt.
26   No. 35-1 at 24.  But *Richter* involved a circumstance in which there was no reasoned decision, at
     any level.  *See Cannedy*, 706 F.3d at 1158 (explaining that "[i]n *Richter*, there was *no* reasoned
27   decision by a lower court; there was no reasoned decision at all") (emphasis in original).  Here, by
     contrast, because the Superior Court issued a reasoned decision, the Court must apply the *Wilson*
28   look through standard.  For his part, petitioner cites *Wilson* in his traverse, Dkt. No. 40 at 23, but
     fails to address its "rebuttable presumption" framework.

United States District Court
Northern District of California

witness at trial." *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999).  In other words, this ground for affirmance was "obvious in the record" before the California Supreme Court, *Wilson*, 138 S. Ct. at 1192, meaning that § 2254(d) deference remains the appropriate standard.[7]  *See Cannedy*, 706 F.3d at 1159 ("The critical inquiry under § 2254(d) is whether, in light of the evidence before the California Supreme Court—the last state court to review the claim—it would have been reasonable to reject petitioner's allegation of deficient performance for any of the reasons expressed by the court of appeal.").[8]

        Applying that "doubly deferential" standard, the California Supreme Court's denial of habeas relief was not contrary to or an unreasonable application of clearly established law or based on an unreasonable determination of the facts.  Petitioner argues that the fact that the first trial ended in a mistrial while the second trial ended in a conviction shows both deficient performance and prejudice.  Dkt. No. 27 at 60.  But the Court agrees with the State that *Strickland* does not countenance this sort of *post hoc* second-guessing of counsel's strategic choices.  "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made." *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (internal citation omitted).  "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107.  Deciding not to call the expert that did not make a difference with eleven jurors in the first trial, and choosing instead to cross-examine the

---

[7] By contrast, on this record it would be illogical to assume that the California Supreme Court instead just overlooked the submission of the excerpts, then rested its affirmance solely on the absence of those excerpts. *See Wilson*, 138 S. Ct. at 1196 (presumption that summary affirmance relied on the same reasoning as earlier reasoned decision may be rebutted where "equivalent evidence presented in [State's] briefing to the federal court . . . establish[es] that the State's highest court relied on a different ground than the lower state court, such as the existence of a valid ground for affirmance that is obvious from the state-court record"), 1197 ("Where there are convincing grounds to believe the silent court had a different basis for its decision than the analysis followed by the previous court, the federal habeas court is free . . . to find to the contrary.").

[8] The Court is unsure whether this aspect of *Cannedy*'s holding remains good law after the Supreme Court's later decision in *Wilson*, as it seems arguably inconsistent with *Wilson*'s rebuttable presumption approach.  But if it does, it supports the State's position here, because the Superior Court expressed an independent ground for its ruling that the documents ultimately submitted later did not negate.

United States District Court
Northern District of California

prosecution's expert witness, was a reasonable tactical choice, and such strategic decisions by counsel are "virtually unchallengeable." *Strickland*, 466 U.S. at 690; *see also Richter*, 562 U.S. at 111 ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.  In many instances cross examination will be sufficient to expose defects in an expert's presentation.").  *Accord Floyd v. Filson*, 949 F.3d 1128, 1144 (9th Cir. 2019) (counsel was entitled to rely on cross-examination of prosecution expert rather than calling defense expert as "a strategic choice between one means of undermining the witness and another"); *Reinert v. Larkins*, 379 F.3d 76, 95 (3d Cir. 2004) ("[C]ounsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony."); *Smith v. Angelone*, 111 F.3d 1126, 1132–33 (4th Cir. 1997) (counsel not incompetent for failing to call expert witness where counsel obtained the same information and pursued the same defense via cross-examination of prosecution experts); *Ellefson v. Hopkins*, 5 F.3d 1149, 1150-51 (8th Cir. 1993) (no ineffective assistance where counsel's strategy was to call into question the weight of the state's serology evidence through his cross-examination of the prosecution expert instead of calling defense expert).  Here, defense counsel thoroughly cross-examined and re-crossed the prosecution's expert at trial.  Dkt. No. 17 at RT 2302–92, 2404–11.

The Court further finds that the California Supreme Court's denial of habeas relief also satisfied the doubly deferential *Strickland* standard on the issue of prejudice.  The record reflects that the prosecution's case was very strong (featuring extensive and credible evidence of threatening and stalking behavior by petitioner, as well as eyewitness identifications and security camera footage), and that petitioner's defense broadly lacked credibility (from his incoherent explanation of why he wanted his gun ownership rights restored, to his interestingly-timed decision to take up target practice at a gun range, to his curious outburst of loud coughing to ensure that his presence at a court hearing shortly after the murder was noted, to note just three examples).  *See* Dkt. No. 27-1 at 501 ("As the Sixth District noted, '[t]he record is replete with evidence showing [Cai] planned Zhao's murder, stalked her, and killed her.'").  And counsel rigorously cross-examined the prosecution's expert.  Thus, even assuming, contrary to the Court's

19

actual finding above, that the state courts unreasonably concluded that defense counsel was not deficient for failing to call a computer forensic expert, petitioner cannot meet his burden of showing that they acted unreasonably in finding no prejudice. *See Panah v. Chappell*, 935 F.3d 657, 669 (9th Cir. 2019) (even if defense counsel was deficient for failing to retain expert to independently analyze pathology and serology evidence, no prejudice resulted where evidence of guilt was strong and counsel adequately challenged state's expert witnesses on the stand); *Howard v. Clark,* 608 F.3d 563, 573–74 (9th Cir. 2010) (no prejudice resulted from counsel's failure to call expert witness on eyewitness identification, where "attorney extensively cross-examined [the eyewitnesses] and, even more significantly, the jurors were instructed on the potential shortcomings of eyewitness testimony").

The state courts' application of the *Strickland* standard was not unreasonable, and habeas relief accordingly is **DENIED** on this ground.

### D.     Burden of Proof

The Superior Court rejected petitioner's argument that by instructing the jury with CALCRIM No. 359, the trial court undercut the presumption of innocence, laying out the relevant background and ruling as follows:

> Petitioner's sole claim now focuses on the fact that the trial court instructed the jury with CALCRIM No. 359.  That instruction, he argues, "[told] jurors they could rely on defendant's 'statements alone' to carry [the state's burden of proving beyond a reasonable doubt the identity of the killer]" and therefore "undercut the presumption of innocence."   Petitioner asserts that the "prosecutor's heavy reliance on this evidence during closing argument is a strong indication of how important the prosecutor 'and so presumably the [fact [finder]' treated the evidence."
>
> The Sixth District analyzed a similar argument in *People v. Rivas* (2013) 214 Cal. App. 4th 1410 (*Rivas*).  A jury convicted defendants *Rivas* and *Carrillo* of first degree murder.  As in the present case, the dead body was found.  The court discussed how "the reference to identity in CALCRIM No. 359 presents a risk of confounding the jury." (*Id*. at p. 1429.) CALCRIM No. 359 tells jurors "that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime—and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' (CALCRIM No. 359, 3d par.), which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party." (*Rivas*, *supra*, at p. 1429.)
>
> Although the Sixth District stated that "the instruction requires reconsideration" (*Rivas*, *supra*, 214 Cal.App.4th at p. 1429), it found that "[b]ecause other evidence

20

strongly pointed to [appellant's] guilt, the error in giving CALCRIM No. 359 did not so badly infect the entire trial that reversal is required." (*Id.* at p. 1430.) The court explained that it looked to "the effect of the error on this jury, not some hypothetical jury, to assure ourselves that the verdict . . . is surely unattributable to the error in instructing with CALCRIM No. 359." (*Id.* at p. 1430, fn. 10; *see Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) The court also found that under the state-law prejudice standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), "there [was] no reasonable probability that, absent the error, the outcome would have been more favorable to [appellant]." (*Id.* at p. 1430.) The *Rivas* court noted that the jury "was told more than once it could find [appellant] guilty of the charged crimes only if convinced beyond a reasonable doubt that he committed them." (*Id.* at p. 1429.) In addition to CALCRIM No. 359 itself stating this, the lower court also instructed the jury with CALCRIM No. 220 "which informed the jury that it must consider all the evidence and find [appellant] not guilty unless the prosecution proved him guilty beyond a reasonable doubt." (*Id.* at p. 1430.)

As in *Rivas*, petitioner's claim here ultimately fails. "The principal purpose of the corpus delicti rule [CALCRIM No. 359] is to ensure that a defendant is not convicted of a crime that never occurred. [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 721.) In the present case, there clearly was a crime. Properly considered evidence of corpus delicti was abundant. Thus, the first two paragraphs of CALCRIM No. 359 were satisfied. The last paragraph merely stated the "beyond a reasonable doubt" standard, which was given elsewhere too. As in *Rivas*, the third paragraph regarding petitioner's identity as the perpetrator was the only part of the instruction to provide the jury with a new and arguably concerning legal statement. Because "[w]e presume the jury understood and followed the court's instructions" (*People v. Jackson* (2016) 1 Cal. 5th 269, 352), petitioner has identified a potential flaw in his prosecution.

However, after consideration of the totality of the record, this court finds any error in instructing the jury with CALCRIM No. 359 was harmless under the *Chapman* standard and therefore under the *Watson* standard as well. "The question is 'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process. [Citations.] '"[A] single instruction to the jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. [Citation.]'" (*Rivas*, *supra*, 214 Cal. App. 4th at p. 1429.) Here, as in *Rivas*, the jury was instructed in both CALCRIM No. 359 and CALCRIM No. 220 that "it must consider all the evidence and find [Cai] not guilty unless the prosecution proved him guilty beyond a reasonable doubt." (*Rivas*, *supra*, 214 Cal. App. 4th at p. 1430.) Because there was overwhelming evidence that "strongly pointed to [Cai's] guilt, giving CALCRIM No. 359 did not so badly infect the entire trial that reversal is required." (*Id.* at p. 1430.)

In petitioner's direct appeal, the Sixth District found "no error, but even if error were present, it would be harmless." (*Cai*, *supra*, H038625 at p. 16.) The same harmless error conclusion applies to the present petition. As the Sixth District noted, "[t]he record is replete with evidence showing [Cai] planned Zhao's murder, stalked her, and killed her. [Cai] tracked Gumina, Darabi, Pierce, and Zhao online." (*Ibid.*) "[Cai] petitioned for reinstatement of his right to own a gun, and took up target practice as Shen persisted with her wrongful death case. [Cai] testified that Shen and Zhao were framing him, and he unconvincingly disputed the testimony of several prosecution witnesses who had no reason to testify untruthfully. One witness identified [Cai] in court as the shooter, and no witness excluded [Cai] as the assailant. Other witnesses testified that [Cai] was physically similar to the shooter, and described the shooter's distinctive hat, which was similar if not identical to the hat [Cai] commonly wore. Defendant exercised his right to testify, and the jury rejected his testimony." (*Ibid.*)

Although the appellate court's analysis may have touched upon statements petitioner made prior to trial that he now disputes as improperly covered by CALCRIM No. 359, this court need not consider such disputed statements in concluding that the evidence of guilt was overwhelming.  And it should not be overlooked that petitioner exercised his right to testify.  His extrajudicial statements were subject to testing, and his in-court denial of guilt was rejected by the jury.  It is not at all likely that petitioner's extrajudicial statements taken alone led the jury to a guilty verdict because CALCRIM No. 359 told the jury such statements alone may prove the identity of the perpetrator.

Petitioner argues that the prosecutor "relied on the [pretrial] statements in urging the jury to convict." But the prosecutor only mentioned petitioner's pretrial statements over one and a half pages of fifty-five pages of closing argument and a half a page of his eighteen-page rebuttal. This court is not persuaded that two pages out of seventy-three constitutes "reliance" on the pretrial statements.

In conclusion, on the record here, "there [was] no reasonable probability that, absent the error [in giving CALCRIM No. 359], the outcome would have been more favorable to [Cai]." (*Rivas*, *supra*, 214 Cal.App.4th at p. 1430.)  As in *Rivas*, this court looks to "the effect of the error on this jury, not some hypothetical jury, to assure ourselves that the verdict . . . is surely unattributable to the error in instructing with CALCRIM No. 359." (*Id.* at p. 1430, fn. 10; see *Chapman*, *supra*, 386 U.S. at p. 24.)

Dkt. No. 27-1 at 499–502.

### i.    Standard of Review

A habeas petitioner is not entitled to relief unless an instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  A claim of state instructional error can be the basis of federal habeas relief only if the error, considered in light of all the instructions given in addition to the trial record, "'so infected the entire trial that the resulting conviction violates due process.'"  *Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (citation omitted).  The test for constitutional error is whether there is a "'reasonable likelihood'" the jury applied the instructions in a way that prevented consideration of constitutionally relevant evidence.  *Id.*  This standard requires petitioner to show more than a "possibility" of misunderstanding, *Weeks v. Angelone*, 528 U.S. 225, 236 (2000), or that the jurors "could have" misinterpreted the instructions, *Tyler v. Cain,* 533 U.S. 656, 658, n.1 (2001).  The challenged instruction must be evaluated in light of the instructions as a whole and the evidence introduced at trial. *Estelle*, 502 U.S. at 72; *Johnson v. Texas,* 509 U.S. 350, 368 (1993) ("In evaluating the

United States District Court
Northern District of California

1    instructions, we do not engage in a technical parsing of this language of the instructions, but

2    instead approach the instructions in the same way that the jury would—with a 'commonsense

3    understanding of the instructions in the light of all that has taken place at the trial'") (citation

4    omitted); *Francis v. Franklin*, 471 U.S. 307, 315 (1985) ("Other instructions might explain the

5    particular infirm language to the extent that a reasonable juror could not have considered the

6    charge to have created an unconstitutional presumption."); *Cupp v. Naughton*, 414 U.S. 141, 146–

7    47 (1973) ("[A] single instruction to a jury may not be judged in artificial isolation, but must be

8    viewed in the context of the overall charge.").

9         The Due Process Clause of the Fourteenth Amendment protects the accused against

10   conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

11   crime with which he or she is charged.  *In re Winship*, 397 U.S. 358, 364 (1970).  This

12   constitutional principle prohibits the State from using evidentiary presumptions in a jury charge

13   that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of

14   every essential element of a crime.  *See Yates v. Evatt*, 500 U.S. 391, 400-03 (1991); *Carella v.

15   California*, 491 U.S. 263, 265–66 (1989).  But instructions that lessen the prosecution's burden

16   will be subject to harmless error review, rather that structural error review, "unless *all* the jury's

17   findings are vitiated."  *Byrd v. Lewis*, 566 F.3d 855, 864 (9th Cir. 2009) (finding application of

18   harmless error analysis of a defective jury instruction was proper because the instructional error

19   concerned only one element and did not vitiate the jury's finding of guilt on the charged offense)

20   (citing *Hedgpeth v. Pulido*, 129 S. Ct. 530, 532 (2008)) (emphasis in original).

21         **ii.    Analysis**

22         First, as discussed earlier, this Court again applies the *Wilson* look through standard given

23   the summary denials in the California Court of Appeal and California Supreme Court following

24   the Superior Court's reasoned opinion.  A potential alternate ground for affirmance appears on the

25   face of the Superior Court's opinion itself: the California Courts of Appeal are split as to whether

26   CALCRIM No. 359 is potentially problematic at all, and the Superior Court followed the case

27   finding a potential concern rather than the case finding no infirmity in the instruction.  Dkt. No.

28   27-1 at 499–501, & n.5 (citing *People v. Rivas*, 214 Cal. App. 4th 1410, 1429 (Sixth App. Dist.

1   2013) for the premise that CALCRIM No. 359 "requires reconsideration"); *cf. People v. Rosales*,

2   222 Cal. App. 4th 1254, 1258 (Second App. Dist. 2014) ("*Rivas* held CALCRIM No. 359 is

3   confusing and should be reconsidered.  We disagree with *Rivas* and find no instructional error.").

4   The Superior Court also recognized that "[i]n petitioner's direct appeal, the Sixth District found

5   'no error'" before adding that "'but even if error were present, it would be harmless.'"  *Id.* at 501.

6   So it is far from clear that the basis for the California Supreme Court's ultimate denial of the

7   habeas petition was a finding that error occurred but was harmless, because an alternative ground

8   is obvious from the record before it.

9           Second, even assuming (without deciding) that the state courts ultimately found that the

10  instruction was actually erroneous, their determination that any error was harmless under

11  *Chapman* was not contrary to or a misapplication of clearly established law or based on an

12  unreasonable determination of the facts.[9]  "When a *Chapman* decision is reviewed under AEDPA,

13  'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination*

14  *itself* was unreasonable.'"  *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (citation omitted) (emphasis

15  in original).  This means that the petitioner must show "that the state court's decision to reject his

16  claim 'was so lacking in justification that there was an error well understood and comprehended in

17  existing law beyond any possibility for fairminded disagreement.'"  *Id.* at 269–70 (citation

18  _____

19  [9] Petitioner argues that the harmless error standard does not apply because the alleged error
    "affect[ed] the burden of proof" and is thus "deemed structural . . . ."  Dkt. No. 27 at 71 (citing
20  *Neder v. United States*, 527 U.S. 1, 8 (1999)); *see also* Dkt. No. 40 at 30 (asserting that "the state
    superior court agreed that the instruction was flawed but found it harmless under *Chapman*,"
21  contradicting "clearly established Supreme Court precedent [holding that] errors which affect the
    burden of proof are deemed 'structural' and require automatic reversal").  That position
22  contradicts *Neder* itself, which explained that the Supreme Court has "often applied harmless-error
    analysis to cases involving improper instructions on a single element of the offense." 527 U.S. at
23  9; *see also Byrd*, 566 F.3d at 864, 867 (explaining that *Pulido* "reinforced the holding in *Neder*
    that unless *all* the jury's findings are vitiated, harmless error review applies," and noting that "the
24  only instructional error recognized by *Pulido* as vitiating all the jury's findings is a defective
    overarching reasonable-doubt instruction as articulated in *Sullivan* [*v. Louisiana*, 508 U.S. 275,
25  281 (1993)].").  The Court finds that the above-described legal standards regarding claimed
    instructional error apply here and thus rejects petitioner's claim that any clearly established
26  Supreme Court law requires a finding of "structural error" precluding a harmless error analysis.
    *See Byrd*, 566 F.3d at 864 (finding that the "California Court of Appeal's application of harmless
27  error to the challenged jury instruction was not an unreasonable application of Supreme Court
    precedent," because even though challenged instruction "subjected one element to a lesser burden
28  of proof, . . . the misstatement regarding that element did not 'vitiate *all* the jury's findings'")
    (internal modifications and citation omitted) (emphasis in original).

United States District Court
Northern District of California

1   omitted).

2          Petitioner fails to meet this high standard here.  As the Superior Court explained, "the jury

3   was instructed in both CALCRIM No. 359 and CALCRIM No. 220 that 'it must consider all the

4   evidence and find Cai not guilty unless the prosecution proved him guilty beyond a reasonable

5   doubt.'"  Dkt. No. 27-1 at 501 (internal brackets and citation omitted); *see also* Dkt. No. 7, CT

6   1804 (CALCRIM 359).  Petitioner argues that his "various statements were entirely insufficient to

7   prove beyond a reasonable doubt his identity as the killer," and contends that "[n]one of the

8   statements admitted guilt on any level," instead "[a]t most . . . express[ing] his frustration with the

9   civil lawsuit, his general thoughts on the American criminal justice system and his candor with

10  police during his arrest."  Dkt. No. 27 at 70.  But the Superior Court found the evidence of guilt

11  "overwhelming," and detailed that evidence at length in its order.  Dkt. No. 27-1 at 501–02.  In

12  particular, the Superior Court emphasized that "petitioner exercised his right to testify," "[h]is

13  extrajudicial statements were subject to testing, and his in-court denial of guilt was rejected by the

14  jury."  *Id.* at 502.  Accordingly, the Superior Court concluded that "[i]t is not at all likely that

15  petitioner's extrajudicial statements *taken alone* led the jury to a guilty verdict because CALCRIM

16  No. 359 told the jury such statements alone *may* prove the identity of the perpetrator," and thus

17  found "no reasonable probability that, absent the error in giving CALCRIM No. 359, the outcome

18  would have been more favorable to Cai."  *Id.* (emphasis in original) (citation and internal

19  modifications omitted).  Fair-minded jurists could agree with that well-reasoned and well-

20  supported conclusion, so the state court's harmlessness determination under *Chapman* was not

21  unreasonable.[10]

22          Habeas relief is **DENIED** as to this claim.

23

24

25  ───────────────────

25  [10] Petitioner again tries to evade AEDPA deference by arguing that "the state court failed to
26  consider critical facts" so as to make its determination of the facts with respect to the overall
    strength of the prosecution's case unreasonable under § 2254(d)(2).  Dkt. No. 27 at 74.  As
27  explained above, as a matter of law the state court did not have to detail every fact in the record in
    reaching its decision, and the Court finds that its assessment was thoroughly consistent with the
28  record such that petitioner cannot meet the "daunting standard" that applies to this claim.  AEDPA
    deference thus remains applicable.

United States District Court
Northern District of California

## IV.   CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability ("COA").  *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id.* § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a COA under 28 U.S.C. § 2253(c) is **GRANTED** as to each of petitioner's three claims.  Each claim involves complex application of the look through doctrine given the ultimate summary denials from the California courts on each issue.  Moreover, in a different context the Ninth Circuit recently distinguished *Perry* and articulated a different standard for the assessment of third-party culpability evidence under the Federal Rules of Evidence.  *See Urias Espinoza*, 880 F.3d at 512–17.  The Court thus finds that reasonable jurists viewing the record could at a minimum find the Court's assessment of the claims "debatable."  *Slack*, 529 U.S. at 484.  The COA does not obviate the requirement that petitioner file a notice of appeal within **thirty (30)** days of this order.

## V.   CONCLUSION

The petition for a writ of habeas corpus is **DENIED**.  The Clerk shall enter judgment in favor of Respondent and close the case.

**IT IS SO ORDERED.**

Dated:   9/26/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge